1 │ EDWARD G. OPERINI (State Bar No. 130541)
Attorney at Law
2 │ 19649 San Jose Avenue
City of Industry, CA 91748
3 │ Tel: 909-822-5041
Fax: 909-822-5044
4 │ ED@EGOLAWS.COM
5 │
6 │ Attorney for Plaintiff Jackson Kwok
7 │         **SUPERIOR COURT OF CALIFORNIA**
                       North  K.T.
8 │   **COUNTY OF ORANGE – CENTRAL JUSTICE CENTER**

9 │ **JACKSON KWOK,** an individual;      **Case No.:**  30-2022-01277371-CU-OE-NJC
10 │                                        **Assigned for All Purposes**
                         Plaintiff,           Judge Craig Griffin
11 │   **vs.**                              **COMPLAINT FOR DAMAGES:**
12 │                                        1.  **BREACH OF CONTRACT**
13 │ **GENERA CORPORATION,** a California   2.  **BREACH OF VERBAL**
      corporation; **T.Y.C. BROTHER**           **AGREEMENT**
14 │ **INDUSTRIAL CO., LTD,** a business entity 3. **BREACH OF THE COVENANT OF**
      of unknown form; **INNOVA HOLDING**        **GOOD FAITH AND FAIR DEALING**
15 │ **CORPORATION,** a business entity of  4.  **NEGLIGENT**
      unknown form; **JERRY WU,** an individual;     **MISREPRESENTATION**
16 │ **CHUN CHI WU,** an individual;        5.  **FRADULENT INDUCEMENT**
                                            6.  **UNFAIR BUSINESS PRACTICES**
17 │ **DOES 1 through 50, inclusive,**      7.  **VIOLATION OF BUSINESS AND**
                                                **PROFESSIONS CODE § 17200 and**
18 │                         Defendants.        **UNFAIR METHODS OF**
                                                **COMPETITION (15 U.S.C. § 45)**
19 │                                        8.  **RETALIATION FOR**
                                                **COMPLAINING OF VIOLATIONS**
20 │                                            **OF CAL. LABOR CODE AND IWC**
                                                **ORDERS (Cal. Lab. Code, § 98.6)**
21 │                                        9.  **VIOLATION OF CAL. LABOR**
                                                **CODE §§ 201 AND 226**
22 │                                        10. **WHISTLEBLOWER PROTECTION**
                                                **(Cal. Lab. Code, § 1102.5)**
23 │                                        11. **INTENTIONAL INFLICTION OF**
                                                **EMOTIONAL DISTRESS**
24 │
25 │                                        **REQUEST FOR JURY TRIAL**
26 │
27 │
           Plaintiff JACKSON KWOK, an individual ("KWOK"), complains and alleges as
28 │ follows:

**THE PARTIES**

1. Genera Corporation (the "Genera USA"), and T.Y.C. BROTHER INDUSTRIAL CO., LTD. (the "Taiwan TYC"), Innova Holding Corporation (the "Innova") and DOES 1-25 will be hereafter referred to as "ENTITY DEFENDANTS."

2. Jerry Wu (the "Wu"), Chun Chi Wu (the "CC Wu"), and Defendants DOES 26 to 50 will be hereafter referred to as "INDIVIDUAL DEFENDANTS."

3. PLAINTIFF KWOK is unaware of the true names and capacities of the defendants sued herein as DOES 1 through 50, inclusive, and therefore, pursuant to Cal. Code of Civ. Proc. § 474, sues these defendants by such fictitious names. Defendants DOES 1 through 50 are responsible in some manner for the activities alleged herein and each was acting as an agent for the others. PLAINTIFF KWOK will amend this Complaint to add the true names of DOES 1 through 50 once they are ascertained. Whenever reference is made to "Defendants," such reference shall include all defendants including DOES 1 through 50, INDIVIDUAL DEFENDANTS, and ENTITY DEFENDANTS.

4. At all relevant times, each of the Defendants acted as a principal, agent, representative, or employee of each of the other Defendants and acted within the course and scope of said agency or representation or employment, and with the permission and ratification of each of the other Defendants.

**JURISDICTION AND VENUE**

5. Jurisdiction is proper pursuant to Cal. Code of Civ. Proc. § 410.10. The amount in controversy exceeds the minimum jurisdictional threshold of this Court.

6. At all times relevant herein, ENTITY DEFENDANTS conducted business in Orange County.

7. PLAINTIFF KWOK'S employment with ENTITY DEFENDANTS was carried out in Orange County.

8. PLAINTIFF KWOK is, and at all times mentioned in this complaint, was a resident of California.

**NATURE OF THE CASE**

9.  Defendant Taiwan TYC is an evil oversea corporation that manipulated an American employee through the DOJ and IRS loophole of doing business in the United States. This case seeks to hold the Defendants accountable for a breach of contract and breach of a verbal agreement. Defendants did not fulfill the terms of Plaintiff Kwok's employment contract by failing to pay the non-discretionary incentives Plaintiff Kwok was entitled to receive based on the work he did from January 2020 through August 31, 2020. Defendants also breached a verbal agreement to renew Plaintiff Kwok's employment contract for another term. Plaintiff Kwok was promised that his contract would be renewed and that he would be paid 5.0% of gross sales to retailers. After numerous promises to renew Plaintiff Kwok's contract, Defendant abruptly replaced Plaintiff Kwok without paying him all of his wages.

**FACTUAL BACKGROUND FOR ALL CAUSES OF ACTION**

10.  On or about February of 1997, Genera USA's now-deceased former President Drue Hsia hired Plaintiff Kwok. Plaintiff Kwok started his employment with Genera USA in the marketing department. Plaintiff Kwok's fierce intelligence, sharp business acumen, and unmatched work ethic resulted in numerous promotions over the course of twelve years. Plaintiff Kwok worked in various capacities in marketing, sales, product management, vendor management, business development, operations, and executive management before becoming Genera USA's President/COO in 2009.

11.  The breadth and depth of Plaintiff Kwok's experience enabled him to excel in his position as President/COO. He grew the business from about $170 million in March 2009 to $285 million in 2019 before being terminated in August 2020. Plaintiff Kwok's final written employment agreement (the "Employment Agreement") was from September 1, 2018 to September, 1, 2020. a true and correct copy of which is attached hereto, marked Exhibit "A" and made a part hereof. Before his written employment contract ended, Defendants and Plaintiff Kwok entered a verbal contract (the "Verbal

Agreement") to extend his employment for an additional two years. Instead, Defendants wrongfully terminated him and failed to pay his earned wages.

12. Due to the nature of his position, Plaintiff Kwok often received commands from the high-level Taiwan TYC personnel, including their officers Defendant Wu, and his father, Chairman CC Wu, and was subjected to their unethical behavior between 2004 to 2020. Plaintiff Kwok did not understand the true nature of this type of arrangement. Taiwan TYC high-level officers do not take any position in Genera USA to avoid corporate criminal liability. For instance, in 2008, The Department of Justice opened an investigation into Taiwan TYC and Genera USA Corporation for price fixing with two other lighting manufacturers, Depo Auto Parts Ind Co Ltd. and Eagle Eyes Traffic Ind Co Ltd., and their US-based subsidiaries Maxzone Vehicle Lighting Corporation and Sabry Lee Limited.

13. Taiwan TYC's Chairman CC Wu directed then Genera USA's President Hsia to coordinate its prices with the competitor's US-based subsidiaries, in a massive price-fixing scheme that would generate roughly an additional One Hundred Twenty Million USD in profit for Taiwan TYC and illegally eliminate any new competitor who tried to enter the United States market. Taiwan TYC's Chairman CC Wu also instructed Genera USA's President Mr. Hsia to cover up any evidence of the violation and to intentionally deceive the Department of Justice at the onset of their investigation.  Mr. Hsia had to bear the burden of this illegal behavior. Due to the tremendous pressure Taiwan TYC's Chairman CC Wu put on Mr. Hsia and the stress of the criminal investigation, Mr. Hsia committed suicide in March 2009.

14. On or about March 2009, Plaintiff Kwok and his wife Annie were called to the scene of the suicide. TYC's Chairman CC Wu told Plaintiff Kwok that "the company has spent enormous resources training you both. It's time you two commit and pay back. Plaintiff Kwok was similarly subject to Genera USA's extreme and outrageous behavior and suffered a nervous breakdown.

15. However, Plaintiff Kwok fully cooperated with the Department of Justice's investigation, which incensed Taiwan TYC's Chairman CC Wu.  Plaintiff Kwok thereby served as Defendant's Taiwan TYC's scapegoat, pressured by the Department of Justice to cooperate for indemnification, with constant reminders that it was conditional to the extent of Defendant's corroboration. However, what extent of corroboration was never defined or confirmed until the Department of Justice completed its investigation roughly in May of 2014.

16.  Indeed, Genera USA's business practices were often unethical and possibly illegal throughout the loophole of DOJ and IRS. For at least fifteen years, from about 2004 until March 2020. Plaintiff Kwok continually and constantly complained to Defendant Wu and Defendant CC Wu about Taiwan TYC's dictating Genera USA's business practice, and warned him their instructions would eventually cause another DOJ and IRS investigation.

17. During the morning of the 2018 Genera USA annual meeting at Taiwan TYC's headquarters before commencement, Plaintiff Kwok met with Taiwan TYC Chairman CC Wu and Defendant Wu. Plaintiff Kwok stated that Pilot is Genera USA's exclusive distribution partner to US/Canada retailers. Plaintiff Kwok said there is a distribution agreement with Pilot that is not due to expire for another year (approximately March 2020) and that there's been no breach that would legally allow us to terminate the agreement.

18. Defendant Wu complained that TYC Taiwan and Genera USA were giving away profits that should belong to TYC Taiwan. Plaintiff Kwok was in disbelief when Defendant Wu told him that throughout the years, Genera USA has been distributing the majority portion of its profit overseas to TYC Taiwan and barely maintains any profit in Genera USA to avoid paying tax and possible DOJ penalties on any trade violations. Plaintiff Kwok shared that the potential revenue from retailers should be Sixty Million Dollars within twenty-four months. Plaintiff Kwok asked if there was any way to preserve the relationship with Pilot since they were loyal and supportive for two

decades. Defendant Wu said of course, we'll think of something. Plaintiff Kwok said that it would take a couple of years to devise and implement a plan to carry out Defendant Wu's orders to undercut/remove Pilot and reminded Defendant Wu that Plaintiff Kwok's employment agreement expires on August 31, 2020. Defendant Wu replied that we'll make the incentive to Plaintiff Kwok's extension (to Plaintiff Kwok's existing employment agreement) even larger than the current one. Plaintiff Kwok said he would accept the offer to extend his contract, but readdressed past concerns regarding price transfer, patent violations, tax evasion and US sanction violations that he had repeatedly raised to Defendant Wu in the past. Defendant Wu said, he's taken care of most of those issues already but never elaborated how he did so.

19. Around April 2019, Defendant Wu followed up with Plaintiff Kwok, asking if he could cut Pilot out and begin serving retailers immediately.

20. On or about July 2019, Defendant Wu called Plaintiff Kwok and was irate to learn things hadn't progressed as he wanted. Defendant Wu said it's absolute for Taiwan TYC to use Genera USA to serve retailers directly. Plaintiff Kwok explained that there was no breach of the agreement that would justify terminating the agreement. In a rage, Defendant Wu ordered Plaintiff Kwok to come up with violations, citing ones like selling to non-retailers and not meeting purchase volume. Defendant Wu ordered Plaintiff Kwok to work with Genera USA's attorney on the breach of the contract with Pilot. Plaintiff Kwok responded those would be lies that would almost certainly trigger a lawsuit and expressed concerns about legal implications not only to Genera USA but to Plaintiff Kwok himself.

21. Defendant Wu's tone softened. He said that he would compensate Plaintiff Kwok 5.0% of Genera USA's gross sales to retailers on all businesses for the initial two years at the end of Plaintiff Kwok extended employment agreement (August 31, 2022), in addition to matching the overall compensation of Plaintiff Kwok's current employment agreement into his additional two years of employment agreement extension. Defendant Wu continued to make promises to Plaintiff Kwok. Due to the pressures from

Defendant Wu for a hostile takeover, Plaintiff Kwok began to incorporate some of Defendant Wu's ploy in a plan to undermine Pilot. This included drafting another distribution agreement with conditions that Pilot would be certain not to be able to satisfy, along with back-ordering Pilot (so they would not meet minimum purchase of new agreement), violation of distribution by selling to eBay customers and withholding new purchases to Taiwan TYC (to intentionally disrupt supply flow to Pilot's customer, therefore continuing causing Pilot's underperformance and equally important, causing Pilot's retail customers to lose faith that would have them more easily transition directly to Genera USA to serve directly).

22. In September 2019, Plaintiff Kwok learned that Genera USA violated a trade sanction by its joint venture with SNT for their factory based in Iran. Plaintiff Kwok participated in six to eight meetings between September 2019 through March 2020 to discuss Defendant Wu's thoughts about a section of the LKQ's vendor agreement that restricted business with vendors in violation of US trade sanctions. Dan Wishart, LKQ's Director of Overseas Product Procurement grew impatient because of Genera USA's delay in executing the vendor agreement. During one meeting in December of 2019 that ensued, Taiwan TYC'S Defendant Wu ordered that they hide the Iran joint ownership through means of temporary transfers and short-term low sell with an option to buy back at a later time. Plaintiff Kwok was shocked by Defendant Wu's command to hide the violation, given the severity of the violation as well Genera USA's experience with DOJ/Federal and civil lawsuits.

23. During December 2019 when Plaintiff Kwok and Annie were back in Taiwan participating at Taiwan TYC's annual meeting. Defendant Wu gifted Plaintiff Kwok a bottle of Yamazaki Whiskey (limited cast, over $900 USD) as a gesture of appreciation for sales achievement again in 2019 and pushed Plaintiff Kwok to takeover Pilot. Defendant Wu reminded Plaintiff Kwok the significant profit margin side would more than cover Plaintiff Kwok's additional 5.0% incentive (of Genera USA's gross sales direct to retailers). After Plaintiff Kwok and Annie's presentation of Genera USA's

part, Taiwan TYC's Chairman CC Wu expressed gratitude for Plaintiff Kwok's and Annie's leadership and sales achievements over all the years at Genera USA and again in 2019. Moreover, CC Wu asked that the leaders from Taiwan TYC's other territories attending that meeting, as well as Taiwan TYC Headquarters, to ask Annie and Plaintiff Kwok how to expand sales and improve operations as Annie presented what changes have happened and what future opportunities exist, attracting the interest and attention of Chairman CC Wu.

24. Around January 2020, Plaintiff Kwok raised concerns to Defendant Wu during a call regarding Taiwan TYC's joint ownership with an Iran factory that violates US trade sanctions. Defendant Wu responded that there's no cause of concern and that he'd take care of it. Plaintiff Kwok proposed maintaining Pilot to service retailers' non-lighting products under the Taiwan TYC brand, since Taiwan TYC would steal their retailer lighting business, but Defendant Wu flatly rejected the proposal. Plaintiff Kwok confronted Defendant Wu saying that he felt like he was being set up for taking the fall to carry out Defendant Wu's unscrupulous orders, some of them clearly major violations to US Federal laws. Plaintiff Kwok said, "you are far away in Taiwan and insulated/protected in your role. In fact, you have no structural authority or liability." Defendant Wu brushed it off saying, you watch too many western movies and are over-thinking things. Taiwan TYC is a very big company as you know and we have the resources to protect and compensate you in the unlikely event that something was to go awry.

25. During all these times, Plaintiff Kwok was led to believe Taiwan TYC would continue business with Pilot USA by co-opting online and retail business and expanding its business model beyond automotive lamps.

26. On or about February 2020, Defendant Wu commanded Plaintiff Kwok to sever the relationship with Pilot and bridge communication with retailers – advising the Vice Presidents at PepBoys, AutoZone and O'Reillys that Genera USA would begin serving them directly. Moreover, under the direction of Defendant Wu, Plaintiff Kwok

successfully recruited David Tang, Andrea Lira and Nguyet Nguyen from Pilot. When Plaintiff Kwok questioned Defendant Wu about the business plan with Pilot, Defendant Wu refused to honor the proposal and let greed overtake him. On or about March 2020, during a conference call with Defendant Wu, aside from providing Defendant Wu updates on Genera USA severed relationship with Pilot, Plaintiff Kwok raised concerns with price transfer from Taiwan TYC's ongoing instructions to Genera USA for lamp purchases even though Genera USA was overstock and writing off purchases. Moreover, Taiwan TYC's lamp price increase to Genera USA in recent years in addition to pressured lamp purchases are deemed diluting Genera USA's profit and shifting the respective profits back to Taiwan TYC. This act of tax evasion act could trigger an IRS investigation and possible criminal charges. Plaintiff Kwok brought up another one of Defendant Wu's primary concerns: cutting off the middleman Pilot and severing the retailer vendor directly. Taiwan TYC could potentially face another antitrust lawsuit. In the existing agreement with Pilot, Taiwan TYC prohibits Pilot from selling online or directly to the consumer to avoid predatory pricing. However, Taiwan TYC is planning to kill off Pilot. What would make Taiwan TYC exempt from an antitrust lawsuit? Defendant Wu said he would address this at Taiwan TYC, so it wouldn't be a problem.

27. Plaintiff Kwok emphasized the pressing legal implications of trade sanctions. Plaintiff Kwok told him the penalties might not just be monetary but could result in prison time for officers, especially US-based within the legal grasp of the law. Defendant Wu said that's been taken care of but offered no details. Jackson further suggested the need for Genera USA to be forthcoming with the US Government on the trade sanctions violation. Defendant Wu said, he'll discuss internally at Taiwan TYC but told Plaintiff Kwok not to take any actions.

28. Plaintiff Kwok informed Defendant Wu around April 2020 that the setup with retailers was complete and already begun shipping products out in March 2020 and that Genera USA's retail team were already in place.

29. On or around May 2020, Plaintiff Kwok was shocked when TYC Taiwan Co-Chairman Taishie (Frank) Chuang called to inform him that he was being replaced on September 1, 2020 by Bill Newman. Plaintiff Kwok asked what happened to Defendant Wu's verbal commitment to extend his employment contract and why he made the decision in the middle of COVID. Mr. Chuang said that Defendant Wu had already finalized his decision and that Bill Newman would be at Genera USA's office July 1, 2020.

30. Over the course of July 2020, Mr. Newman sat down with Plaintiff Kwok on two separate days for no more than four hours, primarily asking about general protocols rather than nuances about the business. It was apparent from their conversation as well as Bill Newman's self-admitted absolute absence of knowledge about the automotive aftermarket, including non-lighting products, market (competitors, customers, product lines) as well as distribution, warehouse management and sales/marketing/business development. He said he's known Defendant Wu for a long time while working in a joint venture operation in China, where he was the assistant production manager at the lighting plant. Plaintiff Kwok believes he was replaced by Bill Newman because he was not aware of the DOJ investigation.

31. On or about August 2020, in a final blow, Defendant Chuang asked Plaintiff Kwok to arrange for his executive staffers to attend a video conference at around 6 pm PST, hosted by Taiwan TYC. In attendance at Taiwan TYC were Chairman CC Wu, Defendant Wu, and approximately another eight of Taiwan TYC management staffers to formally announce the appointment of Bill Newman to replace Plaintiff Kwok's position. Several Genera USA managers, including Joseph Chien (Texas Regional General Manager) and Sek (Zak) Tay (Senior Director of Product Management), voiced their discontent with such abrupt change. Upon Defendant Wu's motion, Taiwan TYC Carlos Ting quickly intercepted by quieting any objections. Bill Newman was also present.

32. On or about September 10, 2020, Plaintiff Kwok was forced to sign General Release Form (the "GRE20") in order to received part of his earned wages. A true and correct copy of which is attached hereto, marked Exhibit "B" and made a part hereof.

33. On or about October 2021, Plaintiff Kwok started his long battle with Defendants to retrieve his earned wages. This is another example of Genera/TYC's unethical business practices. After Plaintiff Kwok was wrongfully terminated, Genera/TYC refused to pay Plaintiff Kwok wages, and Plaintiff Kwok hired legal counsel to fight for the wages that Genera/TYC stole from the Plaintiff Kwok. Genera/TYC dragged Plaintiff Kwok into a costly ten-month attorney-to-attorney negotiation, adding salt to Plaintiff Kwok's injury. Genera/TYC bullied and forced Plaintiff Kwok to settle from $450,000 to $180,000 because Defendants knew Plaintiff Kwok could not keep up with the Plaintiff Kwok's attorney's bills. And on top of this, Genera/TYC never had the intention to fulfill this settlement agreement, (the "GRE22"). The purpose of this settlement agreement is to force Plaintiff Kwok into arbitration and rob Plaintiff Kwok rights to trial by jury, and improperly prevent Plaintiff Kwok from issuing subpoenas to third parties. A true and correct copy of which is attached hereto, marked Exhibit "C" and made a part hereof.

34. Plaintiff Kwok believes that he was wrongfully terminated because he constantly raised concerns to Defendant Wu and because he refused when Taiwan TYC directly ordered him to perform illegal acts within Genera USA. Defendant Wu and Taiwan TYC were not satisfied with Plaintiff Kwok for refusing to do their bidding and constantly challenging their decisions.

35. As a direct and proximate result of Defendant's conduct, Plaintiff Kwok has been damaged in an amount to be proven at trial. Plaintiff Kwok is informed and believes and thereon alleges that it has been damaged by Defendant's conduct in an amount exceeding $6,000,000.00.

36. On or about August 17, 2022, Plaintiff Kwok filed a complaint with the Department of Fair Employment and Housing (DFEH) against Defendants and obtained a Notice of

Case Closure and Right to Sue. A true and correct copy of which is attached hereto, marked Exhibit "D" and made a part hereof.

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

### (Plaintiff against all Defendants)

37. Plaintiff Kwok re-alleges and incorporates each of the foregoing paragraphs as through fully set forth herein.

38. Plaintiff Kwok and Defendants entered into the Employment Agreement on September 1st, 2018. Plaintiff Kwok has complied at all times with the terms of the Employment agreement and fulfilled all required obligations.

39. Defendants, and each of them, have unjustifiably and inexcusably abandoned and failed to perform their obligations and promises under the Employment Agreement, and have thus committed a material breach of the Agreement. Such actions include, but are not limited to, failure to pay Plaintiff Kwok's earned wages, commission, and other benefits per the Employment Agreement.

40. Defendants failed to perform their material obligations under the Employment Agreement although none of Defendants' obligations were waived or excused.

41. As a direct and proximate result of Defendants' breach of the Employment Agreement described hereinabove, Plaintiff Kwok has suffered economic damages, including, but not limited to, lost commissions and/or other compensation and termination. The exact nature and full extent of Plaintiff Kwok's damages have yet to be ascertained. Plaintiff Kwok is informed and believes and thereon alleges that he has been damaged by Defendant's conduct in an amount exceeding $300,000.00. Said damages also include, but are not limited to, compensatory damages, consequential damages, loss of the benefit of the bargain, reliance damages, and other special damages all in excess of this Court's minimum jurisdictional amount.

## SECOND CAUSE OF ACTION

### BREACH OF VERBAL AGREEMENT

### (Plaintiff against INDIVIDUAL DEFENDANTS)

42. Plaintiff Kwok re-alleges and incorporates each of the foregoing paragraphs as through fully set forth herein.

43. Plaintiff Kwok and Defendants entered into a Verbal Agreement July 2019. Plaintiff Kwok has complied at all times with the terms of the Employment Agreement and fulfilled all required obligations.

44. Defendants, and each of them, have unjustifiably and inexcusably abandoned and failed to perform their obligations and promises under the Verbal Agreement, and have thus committed a material breach of the Agreement. Such actions include, but are not limited to, failure to pay Plaintiff Kwok's earned wages, commission, and extension of the existing Employment Agreement.

45. Defendants failed to perform their material obligations under the Verbal Agreement although none of Defendants' obligations were waived or excused.

46. As a direct and proximate result of Defendants' breach of the Verbal Agreement described hereinabove, Plaintiff Kwok has suffered economic damages, including, but not limited to, lost commissions and/or other compensation and termination. The exact nature and full extent of Plaintiff Kwok's damages have yet to be ascertained. Plaintiff Kwok is informed and believes and thereon alleges that he has been damaged by Defendant's conduct in an amount exceeding $6,000,000.00. Said damages also include, but are not limited to, compensatory damages, consequential damages, loss of the benefit of the bargain, reliance damages, and other special damages all in excess of the Court's minimum jurisdictional amount.

## THIRD CAUSE OF ACTION

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### (Plaintiff against all Defendants)

47. Plaintiff Kwok re-alleges and incorporates each of the foregoing paragraphs as through fully set forth herein.

48. An implied covenant of good faith and fair dealing was established when Defendants, and each of them, entered into the Employment Agreement with Plaintiff Kwok on or about September 1, 2018. An implied covenant of good faith and fair dealing was established when Defendants, and each of them, entered into the Verbal Agreement with Plaintiff Kwok on or about July, 2019. Defendants were required to conduct themselves with honesty in the performance of the Employment Agreement and Verbal Agreement and to deal fairly, in good faith, and perform in a way that would not deprive Plaintiff Kwok of the benefits of the Employment Agreement and Verbal Agreement.

49. Defendants, and each of them, breached their implied covenant of good faith and fair dealing, inherent in all contracts in California, by unfairly interfering with and frustrating Plaintiff Kwok's right to receive the benefits of the Employment Agreement and Verbal Agreement, by acting in bad faith, and by engaging in conduct for the purpose of advancing their own interests and avoiding their own performance, including, but not limited to, failure to pay Plaintiff Kwok his required salary, commissions, and other benefits per the terms of the Employment Agreement and Verbal Agreement. The conduct of Defendants described hereinabove was not objectively reasonable and amounted to bad faith which deprived Plaintiff Kwok of the benefits of the Employment Agreement and Verbal Agreement.

## FOURTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

#### (Plaintiff against INDIVIDUAL DEFENDANTS)

50. Plaintiff Kwok re-alleges and incorporates each of the foregoing paragraphs as through fully set forth herein.

51. Defendant Wu made representations to Plaintiff Kwok in connection with the deal for Genera USA to take over Pilot's Sixty Million Dollar Retail business, including but not

limited to promises that Plaintiff Kwok would receive compensation for the revenue, that the Plaintiff Kwok's existing Employment Agreement would be extended for an additional two years, that Plaintiff Kwok would have more control of Genera USA, and that Taiwan TYC would fix all the DOJ and IRS loopholes in its business practice.

52. Plaintiff Kwok had no reasonable grounds to believe these representations to not be true at the time they were made. Plaintiff Kwok is informed and believe and thereupon allege that, he was aware that Defendants never intended to pay Plaintiff Kwok any compensation from the Pilot's retailer business and never intended to extend his Employment Agreement by an additional two years, instead intending that Plaintiff Kwok would leave Genera USA as soon as it was set up and took over Pilot's Business.

53. Plaintiff Kwok is informed and believe and thereupon allege that Defendant Wu intended that Plaintiff Kwok would rely on his Verbal Agreement to extend his Employment Agreement and, as a result of that belief, acted to take over Pilot's business. Plaintiff Kwok did in fact rely on Defendant Wu's representations when entering into those agreements and the deal generally.

54. Plaintiff Kwok was harmed as a direct result of his reliance on Defendant Wu's misrepresentations. He has been released from his Employment Agreement, has been denied his wages, and has been prevented from working as promised by Defendant Wu. Defendant Wu 's misrepresentations have also prevented Plaintiff Kwok from maximizing his earnings under the Employment Agreement and potential earnings on two-year verbal Employment Agreement. Plaintiff Kwok has suffered economic damages, including, but not limited to, lost commissions and/or other compensation and termination. The exact nature and full extent of Plaintiff Kwok's damages have yet to be ascertained. Plaintiff Kwok is informed and believes and thereon alleges that he has been damaged by Defendant's conduct in an amount exceeding $6,000,000.00. Said damages also include, but are not limited to, compensatory damages, consequential damages, loss of the benefit of the bargain, reliance damages, and other special damages all in excess of the Court's minimum jurisdictional amount.

## **FIFTH CAUSE OF ACTION**

### **FRAUDULENT INDUCEMENT**

### **(Plaintiff against INDIVIDUAL DEFENDANTS)**

55. Plaintiff Kwok re-alleges and incorporates each of the foregoing paragraphs as through fully set forth herein.

56. Defendant Wu made representations to Plaintiff Kwok in connection with the deal for Genera USA to take over Pilot's Sixty Million Dollar Retail business, including but not limited to promises that Plaintiff Kwok would receive compensation for the revenue, that the Plaintiff Kwok's existing Employment Agreement would be extended for an additional two years, that Plaintiff Kwok would have more control of Genera USA, and that Taiwan TYC would fix all the DOJ and IRS loopholes in its business practice.

57. Plaintiff Kwok is informed and believe and thereupon allege that Defendant Wu knew these representations to be false at the time they were made or, alternatively, made the representations recklessly without regard for the truth. Defendant Wu, and Defendant CC Wu, generally, never intended for Plaintiff Kwok to continue to work in Genera USA after Plaintiff Kwok brought up many legal issues with Defendants, instead intending that Plaintiff Kwok would leave Genera USA as soon as it took over Pilot's business.

58. Plaintiff Kwok is informed and believe and thereupon allege that Defendant Wu intended that Plaintiff Kwok would rely on the representations in entering into the Verbal Employment Agreement, the Employment Agreement, and the Extension of Employment Agreement. Plaintiff Kwok did in fact rely on Defendant Wu's representations when entering into those agreements.

59. Plaintiff Kwok was harmed as a direct result of his reliance on Defendant Wu's misrepresentations. He was terminated and was released from his Employment Agreement, has been denied his wages, and has been prevented from working as promised by Defendant Wu. Defendant Wu 's misrepresentations have also prevented Plaintiff Kwok from maximizing his earnings under the Employment Agreement and

potential earnings on two-year verbal Employment Agreement. Plaintiff Kwok has suffered economic damages, including, but not limited to, lost commissions and/or other compensation and termination. The exact nature and full extent of Plaintiff Kwok's damages have yet to be ascertained. Plaintiff Kwok is informed and believes and thereon alleges that he has been damaged by Defendant's conduct in an amount exceeding $6,000,000.00. Said damages also include, but are not limited to, compensatory damages, consequential damages, loss of the benefit of the bargain, reliance damages, and other special damages all in excess of the Court's minimum jurisdictional amount.

### SIXTH CAUSE OF ACTION

**UNFAIR BUSINESS PRACTICES**

**BUSINESS AND PROFESSIONS CODE SECTION 17200, ET SEQ.**

**(Plaintiff against ENTITY DEFENDANTS)**

60. Plaintiff Kwok re-alleges and incorporates each of the foregoing paragraphs as through fully set forth herein.

61. Defendants' violations of the Labor Code and the Wage Order, including Defendants failure to pay Plaintiff Kwok his earned wages, and their retaliation against Plaintiff Kwok for exercising his rights under FMLA and CFRA constitute unfair business practices in violation of the Unfair Competition Law ("UCL").

62. Plaintiff Kwok has suffered injury in fact and has lost money or property as a result of Defendants' unfair business practices, and Defendants have reaped unfair benefits and illegal profits at Plaintiff Kwok s expense.

63. Plaintiff Kwok is entitled to immediate possession of all amounts owed to him by Defendants, with interest.

64. Defendants' unfair business practices entitle Plaintiff Kwok to seek preliminary and permanent injunctive relief, including but not limited to orders that Defendants account for, disgorge, and restore to Plaintiff Kwok the compensation unlawfully withheld from him.

65. As a legal and proximate result of Defendants' actions, Plaintiff Kwok has suffered special and general damages in an amount to be proven at trial.

66. Plaintiff Kwok is also entitled to reasonable attorneys' fees and costs incurred by her in this action for Defendants' violations of the UCL.

**SEVENTH CAUSE OF ACTION**

**VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200**

**UNFAIR METHODS OF COMPETITION (15 U.S.C. § 45)**

**(Plaintiff against ENTITY DEFENDANTS)**

67. Plaintiff Kwok re-allege and incorporate each of the foregoing paragraphs as through fully set forth herein.

68. Federal law prohibits unfair methods of competition 15 U.S.C. § 45 et seq. Unfairness can include fraud, lack of good morals, deception, bad faith, and oppression.

69. Plaintiff Kwok is informed and believe and thereupon allege that Defendant Wu and Defendant CC Wu aforementioned conduct was false, misleading, and fraudulent.

70. Plaintiff Kwok reserve the right to allege other violations of law, which constitute other unlawful or unfair competition as such conduct is ongoing.

71. Plaintiff Kwok has been harmed by Defendant Wu and Defendant CC Wu unlawful and unfair competition and the harm was proximately cause by Defendant Wu, and Defendant CC Wu, and Defendants.

**EIGHTH CAUSE OF ACTION**

**RETALIATION FOR COMPLAINING OF VIOLATIONS OF CAL. LABOR**

**CODE AND IWC ORDERS (Cal. Lab. Code, § 98.6)**

**(Plaintiff against ENTITY DEFENDANTS)**

72. Plaintiff Kwok re-alleges and incorporates each of the foregoing paragraphs as through fully set forth herein.

73. At all times herein mentioned, Cal. Lab. Code, § 98.6, was in full force and effect and was binding on ENTITY DEFENDANTS. This statute forbids ENTITY DEFENDANTS from retaliating against PLAINTIFF KWOK for complaining of,

threatening to file actions for, and filing actions for wrongful employment practices forbidden by the Labor Code.

74. PLAINTIFF KWOK complained to ENTITY DEFENDANTS about its unlawful employment practices, including but not limited to its DOJ antitrust lawsuit, and US Sanction Iran, and Tax evasion.

75. Rather than address PLAINTIFF KWOK's complaints, ENTITY DEFENDANTS terminated PLAINTIFF KWOK's employment in retaliation for his complaints. As a proximate result of ENTITY DEFENDANTS' retaliatory conduct, PLAINTIFF KWOK has suffered and continues to suffer lost wages, humiliation, emotional distress, and mental and physical pain and anguish, all to their damage in a sum according to proof.

76. ENTITY DEFENDANTS' retaliation against PLAINTIFF KWOK was done intentionally, in a malicious, oppressive manner, entitling PLAINTIFF KWOK to punitive damages.

77. PLAINTIFF KWOK has incurred and continues to incur legal expenses and attorneys' fees in a sum according to proof.

78. As a proximate result of ENTITY DEFENDANTS' retaliatory conduct, PLAINTIFF KWOK has suffered and continues to suffer lost wages, humiliation, emotional distress, and mental and physical pain and anguish, all to their damage in a sum according to proof.

## NINTH CAUSE OF ACTION

### VIOLATION OF CAL. LABOR CODE §§ 201 AND 226

### (Plaintiff against ENTITY DEFENDANTS)

79. Plaintiff Kwok re-alleges and incorporates each of the foregoing paragraphs as through fully set forth herein.

80. At all relevant times, Cal. Labor Code § 201 was in full force and effect and was binding on Taiwan TYC and Genera USA. Section 201 provides that "[i]f an employer

discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately.

81. Taiwan TYC and Genera USA violated Cal. Labor Code § 201 by failing to pay Plaintiff Kwok all commissions owed to him at the time of termination.

82. As a proximate result of the aforementioned wrongful conduct, liability for which has been assigned to ENTITY DEFENDANTS, Plaintiff Kwok has sustained and continues to sustain substantial losses, including but not limited to the unpaid commissions owed to him over and above the guaranteed minimum set forth in the Commission Schedule, from January 2020 forward.

83. Moreover, Plaintiff Kwok is entitled to penalties for violations of pursuant to California Labor Code §226. California employers are required to provide every employee with an accurate wage statement that sets forth the employee's gross wages, total hours worked, all deductions taken and net wages earned, amongst other things. Since commissions owed were omitted, Plaintiff Kwok's wage statements inaccurately set forth his gross wages, entitling him $50 for the initial pay period in which a violation occurs and $100 per pay period for each additional violation up to $4,000, plus an award of reasonable attorney's fees and costs.

## TENTH CAUSE OF ACTION

### WHISTLEBLOWER PROTECTION (Cal. Lab. Code, § 1102.5)

### (Plaintiff against ENTITY DEFENDANTS)

84. Plaintiff Kwok re-alleges and incorporates each of the foregoing paragraphs as through fully set forth herein.

85. ENTITY DEFENDANTS were Plaintiff Kwok's employers.

86. Plaintiff Kwok reasonably believed that ENTITY DEFENDANTS' policies violated federal, state, or local statutes, rules or regulations.

87. Plaintiff Kwok complained to his supervisors regarding such violations.

88. ENTITY DEFENDANTS believed that Plaintiff Kwok might disclose information of ENTITY DEFENDANTS' violation of statutes, rules, or regulations to a government agency or law enforcement agency.

89. ENTITY DEFENDANTS discharged Plaintiff Kwok.

90. ENTITY DEFENDANTS' belief that Plaintiff Kwok might disclose this information in addition to Plaintiff Kwok's complaints to her supervisors regarding such violations were a contributing factor in ENTITY DEFENDANTS' decision to discharge Plaintiff Kwok.

91. Plaintiff Kwok was harmed.

92. ENTITY DEFENDANTS' conduct was a substantial factor in causing Plaintiff Kwok's harm.

93. Plaintiff Kwok has incurred and continues to incur legal expenses and attorneys' fees in a sum according to proof.

94. As a proximate result of ENTITY DEFENDANTS' retaliatory conduct, Plaintiff Kwok has suffered and continues to suffer lost wages, humiliation, emotional distress, and mental and physical pain and anguish, all to their damage in a sum according to proof.

## ELEVENTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

#### (Against All Defendants)

95. Plaintiff Kwok re-alleges and incorporates each of the foregoing paragraphs as through fully set forth herein.

96. Defendants' conduct toward Plaintiff Kwok was outrageous.

97. Defendants either intended to cause Plaintiff Kwok emotional distress or acted with reckless disregard of the probability that Plaintiff Kwok would suffer emotional distress.

98. Plaintiff Kwok suffered severe emotional distress.

99. Defendants' conduct was a substantial factor in causing Plaintiff Kwok's severe emotional distress.

100.     As a proximate result of Defendants' retaliatory conduct, Plaintiff Kwok has suffered and continues to suffer lost wages, humiliation, emotional distress, and mental and physical pain and anguish, all to their damage in a sum according to proof.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgement as follows:

1.     For economic damages, emotional distress damages, and consequential damages in an amount to be proven at heal;

2.     For back pay, front pay, and other monetary relief according to proof;

3.     For general damages according to proof;

4.     For special damages according to proof;

5.     For punitive damages according to proof;

6.     For costs and expenses of suit incurred herein;

7.     For pre and post-judgment interest on the sum of damages awarded;

8.     For attorneys' fees pursuant to law;

9.     For statutory awards as permitted by law;

10.    For Waiting Time penalties as per code;

11.    For injunctive relief from Defendants' unfair business practices;

12.    For such other and further relief as the Court may deem just and proper.

Dated: August 24, 2022

EDWARD G. OPERINI
Attorney for Plaintiff

//

//

//

//

## **REQUEST FOR JURY TRIAL**

PLAINTIFF hereby requests a trial by jury as to all triable issues in the above-entitled action.

Dated: August 24, 2022

_____
EDWARD G. OPERINI
Attorney for Plaintiff

# EXHIBIT A

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "**Agreement**") is made and entered into as of <u>1st of September, 2018</u> (the "**Effective Date**"), between Innova Holding Corporation, a Delaware corporation ("**Company**"), and Jackson Kwok, an individual (the "**Executive**").

    **1.0**    <u>RECITALS.</u>

        **1.1**    Executive has been employed by the Company's wholly owned subsidiary, Genera Corporation ("**Genera**"), since February 1997, as its President and Chief Operating Officer. For the purpose of continuing to perform Executive's duties and services, as now performed for Genera, the parties hereto desire to enter into this Agreement.

        **1.2**    As an executive of Genera, Executive will have access to valuable confidential and proprietary information used in the business of Genera and its Affiliates, including financial data, customer data, operational data, trade secrets and other intellectual property that if disclosed to or used by competitors, potential competitors or any third party would cause irreparable harm to Genera and its Affiliates, and as a result, Executive and the Company desire to provide Genera and its Affiliates with adequate protection from the unauthorized disclosure or use of Genera's or Affiliates' confidential and proprietary information.

  NOW, THEREFORE, IN CONSIDERATION of the foregoing facts, the mutual covenants and agreements contained herein and other good and valuable consideration, the Company and Executive agree as follows:

    **2.0**    <u>DEFINITIONS.</u>

        **2.1**    "**Affiliate**" means, with respect to any party, any corporation, limited liability company, partnership, joint venture, firm and/or other entity which Controls, or is under common Control with such party.

        **2.2**    "**Board of Directors**" means the board of directors of Genera.

        **2.3**    "**Competing Business**" means a business that competes with or intends to compete with the business of Genera and its Affiliates

        **2.4**    "**Confidential Information**" means all confidential or proprietary information, techniques or business methods pertaining to the Company or its Affiliates or their businesses, operations, financial affairs, customers, clients, referral sources, patients, consultants, suppliers, vendors or business associates, whether in writing, in computer form, reduced to a tangible form in any medium, or conveyed orally, including, without limitation: (i) the names, addresses, phone numbers, accounts, financial information, and other information concerning customers, suppliers and clients of Genera or its Affiliates; (ii) non-public information and materials describing or relating to Genera's or its Affiliates' business or financial affairs, including but not limited to financial and/or investment performance information, pricing, costs, personnel matters, products, operating procedures, organizational responsibilities, marketing matters, or policies or procedures of Genera or its Affiliates; (iii)

information and materials describing Genera's or its Affiliates' existing or new products and services, including analytical data and techniques, and product, service or marketing concepts under development at or for Genera or its Affiliates, and the status of such development; (iv) information relating to the computer systems and network of Genera or its Affiliates (including, without limitation, data files, software, and source code); (v) the business or strategic plan of Genera or its Affiliates; (vi) acquisition candidates; or (vii) prospective new locations to conduct the business of Genera or its Affiliates.

2.5 "**Control**" means (i) in the case of corporate entities, direct or indirect ownership of at least fifty percent (50%) of the stock or participating assets entitled to vote for the election of directors; and (ii) in the case of non-corporate entities (such as individuals, limited liability companies, partnerships or limited partnerships), either (A) direct or indirect ownership of at least fifty percent (50%) of the equity interest, or (B) the power to direct the management and policies of the non-corporate entity.

2.6 "**Covered Entity**" means every Affiliate of Executive, and every business, association, trust, corporation, partnership, limited liability company, proprietorship or other entity in which Executive has an investment (whether through debt or equity securities), or maintains any capital contribution or made any advances to, or in which any Affiliate of Executive has an ownership interest or profit sharing percentage. The agreements of Executive contained herein specifically apply to each entity which is presently a Covered Entity or which becomes a Covered Entity subsequent to the date of this Agreement.

2.7 "**Company Discharge**" shall mean the Genera's termination of Executive's employment hereunder during the term hereof for any reason other than due to Executive's death or Permanent Disability. For the avoidance of doubt, the decision by the Company not to renew the Term shall not be deemed a Company Discharge.

2.8 "**Permanent Disability**" shall mean Executive's inability to perform Executive's duties hereunder, due to a physical or mental condition (diagnosed by a board certified physician approved by the Company) for a period of ninety (90) consecutive days or an aggregate of one hundred twenty (120) days in any twelve (12) month period.

2.9 "**Subsidiary**" shall mean any corporation, trust, general or limited partnership, limited liability company, firm, company or other business enterprise which is Controlled by the Company through direct ownership of the stock or other proprietary interests of such business enterprise or indirectly through the ownership of stock or other proprietary interests in one (1) or more other business enterprises which are connected with the Company by means of one (1) or more chains of business enterprises that are connected by ownership of stock or other proprietary interests.

3.0 CAPACITIES AND DUTIES; INDEMNIFICATION.

3.1 Title: Executive is hereby employed in the capacity of President and Chief Operating Officer of Genera. Executive shall report directly to Genera's board of directors. Executive will at all times abide by Genera's written personnel policies applicable to similarly situated employees of Genera as in effect from time-to-time and previously provided

- 2



to Executive, and will faithfully, industriously and to the best of Executive's ability, experience and talents perform all of the duties that may be required of and from Executive pursuant to the terms hereof. Any changes to Executive's duties and responsibilities contemplated by this Agreement will be subject to the approval of Mr. Chun Chi Wu, a board member of Genera and the Company. Executive shall use his best effort to ensure Genera's incremental business growth year over year in terms of sales and profits after tax. Executive shall continue to use his best efforts and diligently perform his assigned duties and responsibilities including but not limited to training the nominated successor and the transition of his duties.

       **3.2**    Indemnification:  The Company shall indemnify and hold harmless Executive for any bona fide claim or settlement (excluding any dispute, claim or controversy arising under or relating to this Agreement other than a dispute, claim or controversy seeking to enforce the terms of this Section 3.2) resulting in actual loss, injury, damage, expense (including reasonable attorneys' fees, and costs) (collectively, "**Losses**") to the Executive, arising out of, connected with, or in any manner related to, any act, omission, or decision of, to the extent permitted by the by-laws and charter of the Company as in effect on the Effective Date, or if greater coverage or amount, as amended thereafter, the Executive made in good faith while performing services for Genera during the Term of this Agreement. Notwithstanding the foregoing, (a) Executive shall not be entitled to indemnification under this Section 3.2 with respect to any Losses which arise out of any act or omission by Executive involving fraud or intentional or knowing misconduct by Executive, and (b) Executive shall not be entitled to indemnification under this Section 3.2 with respect to any action, suit or proceeding initiated by Executive against Genera, the Company or any of its Affiliates, or any of their respective owners, managers, directors or officers, other than a proceeding to enforce the terms of this Section 3.2.

**4.0**    TERM.

       **4.1**    Term:  Subject to Sections 4.2, 4.3, and 4.4, the term of this Agreement shall commence on the Effective Date and shall continue for two (2) years from the Effective Date (the "**Term**").

       **4.2**    Termination of Employment:  Executive's employment under this Agreement may be immediately terminated by Genera upon written notice to Executive of a Company Discharge that is a termination for Cause and upon thirty (30) days' prior written notice of a Company Discharge that is a termination other than for Cause, as approved by the Board of Directors. For the purposes of this Agreement, termination for "**Cause**" shall mean termination because of Executive being convicted of, or entering a plea of *nolo contendere* to, a felony or a misdemeanor involving an act of moral turpitude, any gross negligence by the Executive in performing his job responsibilities to Genera that was or is materially injurious to Genera, any material breach by the Executive of this Agreement which is not cured within ten (10) days after written notice thereof by the Company to Executive, or any material breach by the Executive of Genera's written company policies which is not cured within ten (10) days after written notice thereof by Genera's board of directors to Executive. Upon termination of Executive's employment pursuant to this Section 4.2 other than for Cause, and conditioned

upon the Executive entering into, and not revoking, a general release of claims in favor and in a form provided by and acceptable to the Company, the Company shall ensure Genera will, and cause Genera to, (i) continue to pay insurance coverage for Executive's health, medical and dental insurance, as then in effect pursuant to Section 6.5, for the 18-month period ("**Continuance Insurance Period**") following the date of termination; and (ii) pay to Executive the Retention Bonus (as defined in Section 6.6 below), in exchange for the aforementioned general release, to the extent any installment(s) have not yet been paid to Executive as of the date of termination. Upon the expiration of the Continuance Insurance Period and until the 48-month period following the date of termination, provided that the Executive secures alternate health insurance coverage with the same coverage as then in effect pursuant to Section 6.5, through one or more of COBRA, Medicare, a private health insurance policy or other insurance coverage mechanism, the Company will cause Genera to fully reimburse the Executive for the out-of-pocket insurance premium the Executive has paid for such coverage. Executive should be responsible for all tax burdens arising out of the foregoing continuous insurance coverage. For the avoidance of doubt, Genera will not pay the foregoing continuous insurance coverage if (i) the Executive voluntarily terminates his employment with Genera or (ii) the Executive is terminated for Cause.

      4.3 <u>Termination Upon Death</u>:   This Agreement shall be immediately terminated without action or notice by either party upon the death of Executive and without further obligation by Genera, except for payment of all amounts of base salary compensation, pro-rated bonus, pro-rated Executive's Profit Share, expense reimbursement and vacation (owed pursuant to Sections 6.1, 6.2, 6.3, 6.4 and 6.6) accrued and unpaid to the effective date of termination.

      4.4 <u>Termination Upon Permanent Disability:</u>  Executive's employment under this Agreement may be immediately terminated by Genera upon written notice of a termination for the Permanent Disability of Executive. Upon termination pursuant to this Section 4.4, Genera shall have no further obligation to Executive, except payment of base salary compensation, pro-rated bonus, pro-rated Executive's Profit Share, expense reimbursement and vacation (owed pursuant to Sections 6.1, 6.2, 6.3, 6.4 and 6.6) accrued and unpaid through the effective date of termination.

**5.0**    <u>INTELLECTUAL PROPERTY: RESTRICTIVE COVENANTS.</u>

      **5.1**    <u>Non-Disclosure and Non-Use of Genera's Confidential Information</u>: At all times both during employment of Executive with Genera, and after the employment relationship with Genera has ended for any reason, Executive agrees that he will not, either directly or indirectly, and Executive will not permit any Covered Entity which is Controlled by Executive to, either directly or indirectly, (i) divulge, use, disclose (in any way or in any manner, including by posting on the Internet), reproduce, distribute, or reverse engineer or otherwise provide the Confidential Information of Genera or its Affiliates to any person, firm, corporation, reporter, author, producer or similar person or entity; and (ii) take any action that would make available Confidential Information to the general public in any form, except (i) as required in connection with the performance of such Executive's duties to Genera, (ii) as required to be included in any report, statement or testimony requested by any municipal, state or national regulatory body having jurisdiction over Executive or any Covered Entity which is

Controlled by Executive, (iii) as required in response to any summons or subpoena or in connection with any litigation, (iv) to the extent necessary in order to comply with any law, order, regulation, ruling or governmental request applicable to Executive or any Covered Entity which is Controlled by Executive, (v) as required in connection with an audit by any taxing authority, or (vi) as permitted by the express written consent of the Board of Directors.  In the event that Executive or any such Covered Entity which is Controlled by Executive is required to disclose Confidential Information pursuant to the foregoing exceptions, Executive shall promptly notify Genera of such pending disclosure and assist Genera (at Genera's expense) in seeking a protective order or in objecting to such request, summons or subpoena with regard to the Confidential Information.  If Genera does not obtain such relief after a period that is reasonable under the circumstances, Executive (or such Covered Entity) may disclose that portion of the Confidential Information which counsel to such party advises such party that they are legally compelled to disclose.  In such cases, Executive shall promptly provide Genera with a copy of the Confidential Information so disclosed.  This provision applies without limitation to unauthorized use of Confidential Information in any medium, writings of any kind containing such information or materials including books, and articles blogs, websites, or writings of any other kind, or film, videotape, or audiotape.  Nothing in this Section 5.1 or otherwise in this Agreement shall limit or restrict in any way Executive's immunity from liability for disclosing Genera's trade secrets as specifically permitted by 18 U.S. Code Section 1833, the pertinent provisions of which are attached hereto as Exhibit A.

      **5.2**    Inventions.

        (i)    Inventions Retained and Licensed:  Executive has attached hereto, as Exhibit B, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by Executive prior to Executive's employment with Genera (collectively referred to as "**Prior Inventions**"), which belong to Executive, which relate to Genera's proposed business, products or research and development, and which are not assigned to Genera hereunder; or, if no such list is attached, Executive represents that there are no such Prior Inventions.  If in the course of Executive's employment with Genera, Executive incorporates into a Company product, process or service a Prior Invention owned by Executive or in which Executive has an interest, Executive hereby grants to Genera a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or service, and to practice any method related thereto.

        (ii)    Assignment of Inventions:  Executive agrees that Executive will promptly make full written disclosure to Genera, will hold in trust for the sole right and benefit of Genera, and hereby assign to Genera, or its designee, all Executive's right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which Executive may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time Executive is in the employ of Genera (collectively referred to as "**Inventions**"), except as provided in Section 5.2(vi) below.  Executive further acknowledges that all original works of authorship which are made by Executive (solely or jointly with others) within the scope of and during the period of Executive's employment with Genera and which are  protectable by copyright

are "works made for hire," as that term is defined in the United States Copyright Act. Executive understands and agrees that the decision whether or not to commercialize or market any invention developed by Executive solely or jointly with others is within Genera's sole discretion and for Genera's sole benefit and that no royalty will be due to Executive as a result of Genera's efforts to commercialize or market any such invention.

(iii)   <u>Inventions Assigned to the United States</u>: Executive agrees to assign to the United States government all Executive's right, title, and interest in and to any and all Inventions whenever such full title is required to be in the United States by a contract between Genera and the United States or any of its agencies.

(iv)   <u>Maintenance of Records</u>: Executive agrees to keep and maintain adequate and current written records of all Inventions made by Executive (solely or jointly with others) during the term of Executive's employment with Genera. The records will be in the form of notes, sketches, drawings, and any other format that may be specified by Genera. The records will be available to a

(v)   <u>Patent and Copyright Registrations</u>: Executive agrees to assist Genera, or its designee, at Genera's expense, in every proper way to secure Genera's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to Genera of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which Genera shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to Genera, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. Executive further agrees that Executive's obligation to execute or cause to be executed, when it is in Executive's power to do so, any such instrument or papers shall continue after the termination of this Agreement. If Genera is unable because of Executive's mental or physical incapacity or for any other reason to secure Executive's signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to Genera as above, then Executive hereby irrevocably designates and appoints Genera and its duly authorized officers and agents as Executive's agent and attorney in fact, to act for and in Executive's behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by Executive.

(vi)   <u>Exception to Assignments</u>: Executive understands that the provisions of this Agreement requiring assignment of Inventions to Genera do not apply to any invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as <u>Exhibit C</u>). Executive will advise Genera promptly in writing of any inventions that Executive believes meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on <u>Exhibit B</u>.

5.3   <u>Return of Company Property</u>: If Executive ceases to work for Genera for any reason, Executive shall return to Genera all Confidential Information (and will not keep in his possession, recreate or deliver to anyone else) in any form or media and all copies thereof,

- 6



shall return all Confidential Information from any computers Executive owns or uses outside Genera, delete all Confidential Information after returning such information to Company from any computers Executive owns or uses outside Genera, and shall participate in an exit interview for the purpose of ensuring that the Confidential Information and business relationships will not be put at risk in any new position Executive may assume.

**5.4** Non-Solicitation and Non-Compete:

(i) Non-Solicitation. During the term of Executive's employment with Genera or any Affiliate of Genera and for twenty-four (24) months after Executive's termination for any reason (the "**Restrictive Period**"), Executive agrees that he will not, in any manner, directly or indirectly, solicit, or attempt to solicit any person who is an employee or consultant of Genera or any Affiliate of Genera to apply for or accept employment with Executive or any Covered Entity.

(ii) Non-Compete. Executive expressly covenants and agrees that, during the term of employment with Genera, he will not engage, directly or indirectly, in and he will not and will cause his Affiliates not to, directly or indirectly, own, manage, operate, join, or control any Competing Business anywhere in the world.

**5.5** Confidentiality: Executive agrees to keep the terms and conditions of this Agreement in strict confidence, and that he will not disclose any information concerning this agreement to anyone other than his immediate family members(s) and lawyer(s), except to the extent any disclosure is required by law, regulation, or court order. Executive hereby acknowledges and agrees that it shall be responsible for any breach of this Agreement by the foregoing family member (s) and Lawyer(s).

**6.0** COMPENSATION AND BENEFITS. For Executive's services, the Company shall ensure that Genera will, and cause Genera to, pay Executive compensation as follows, in accordance with Genera's general payroll practices:

**6.1** Salary: Executive's base compensation shall be equal to an annual base salary of US$338,400 for calendar year 2018, US$405,000 for calendar year 2019, and US$270,000 for the period from January 1, 2020 through August 31, 2020.

**6.2** Bonus: In the event that, in a given year (or in the case of 2020, the 8-month period), Genera undergoes business growth based on PBIT (profits before interest and tax) as compared to the previous year (or in the case of 2020, the prior comparable 8-month period), Executive shall be paid a guaranteed annual bonus payment of US$515,000 for such year 2018 & 2019 but US$350,000 for the period from January 1, 2020 through August 31, 2020 (each such guaranteed annual bonus payment, the "**Guaranteed Annual Bonus**"); payable on the annual bonus payout date according to Genera's company policies, which annual bonus payment may be pro-rated to the extent Executive's services to Genera is terminated during any applicable year. In the event that, in a given year (or in the case of 2020, the 8-

- 7 -

month period), Genera fails to undergo business growth based on PBIT as compared to the previous year (or the prior comparable 8-month period if determining annual bonus for 2020), 85% of the Guaranteed Annual Bonus for the applicable year (or the 8-month period in the case of 2020) shall be guaranteed and paid to Executive and Genera has the right to discuss with Executive the remaining 15% of the Guaranteed Annual Bonus to be paid to Executive, which shall be approved by Mr. Chun Chi Wu, Board member of Genera.

**6.3**   Reimbursement of Expenses:  The Company shall ensure Genera will reimburse Executive for any reasonable business expenses incurred by Executive in the ordinary course of Genera's business in accordance with Genera's reimbursement policies then in effect.  These expenses shall be substantiated by invoices and receipts, to be submitted by Executive within thirty (30) days after incurrence; provided, however, that any such reimbursements shall not be paid or payable later than sixty (60) days following the Executive's termination of employment.

**6.4**   Profit Share:  The Profit Share equals to 15% x (Profit after Tax – 6% x Shareholder Equity).Upon prior approval by Mr. Chun Chi Wu (Genera's board member), Executive, at his discretion may allocate the Profit Share to Genera's key staff, including Executive himself (the amount that the Executive is entitled to receive shall be referred to as the "Executive's Profit Share"). During the Term of this Agreement, Executive is entitled to receive a pro-rated Executive's Profit Share based on Executive's time of employment with Genera for the year of 2018 and 2020; and a full amount of the Executive's Profit Sharing for the year of 2019.

**6.5**   Benefits:   In addition to the health and welfare benefits generally available to Genera's other executives, including any sick leave, medical, dental, life and disability insurance benefits, Executive shall be permitted to participate in Genera's 401(k) plan and 4 weeks of vacation per year.  Genera reserves the right to change, through addition, deletion or modification, any component of the employee fringe benefit package without any change in the salary paid to Executive, at any time, provided that such addition, deletion or modification also applies to other Genera's executives.

**6.6**   Retention Bonus: The Company shall ensure that Genera will, and cause Genera to, pay Executive a retention bonus in the amount of US$2,050,000 ("**Retention Bonus**").  The Retention Bonus will be paid in two separate installments: the initial fifty percent (50%) will be paid to Executive within sixty (60) calendar days upon the Effective Date and the remaining fifty percent (50%) will be paid on June 30, 2019 (each, a "**Retention Bonus Payout Date**").  If (i) the Executive terminates its employment with Genera or (ii) the Executive's employment is terminated for Cause by Genera prior to the a Retention Bonus payout date, then Executive shall not be entitled to the Retention Bonus installment(s) payable as of the date of termination.   Notwithstanding the foregoing, if the Executive terminates his employment with Genera after the Second Retention Bonus Payout Date but before the expiration of the Term, then Executive shall unconditionally and immediately refund to Genera



an amount equal to $410,000 multiplied by a fraction, the numerator of which shall be the number of months remaining on the Term as of the date of termination and the denominator of which is 24 months.

      **6.7**   Withholding: Executive authorizes Genera to make any and all applicable withholdings of federal and state taxes and other items Genera may be required to deduct, as such items may exist under this Agreement or otherwise from time to time.

**7.0**   SUCCESSORS AND ASSIGNS. This Agreement is intended to bind and inure to the benefit of and be enforceable by Executive, the Company and their respective heirs, successors and assigns, except that Executive shall not have any right to assign or otherwise transfer this Agreement, or any of Executive's rights, duties or any other interest herein to any party without the prior written consent of the Company, and any such purported assignment shall be null and void.

**8.0**   SURVIVAL OF RIGHTS AND OBLIGATIONS. The rights and obligations of the parties as stated herein shall survive the termination of this Agreement.

**9.0**   ENTIRE AGREEMENT.

      **9.1**   Sole Agreement: This Agreement (including any attachments and exhibits hereto), any non-competition, non-solicitation, confidentiality or proprietary information agreement contain the parties' sole and entire agreement regarding the subject matter hereof, and supersedes any and all other agreements, statements and representations of the parties.

      **9.2**   No Other Representations: The parties acknowledge and agree that no party has made any representations (i) concerning the subject matter hereof, or (ii) inducing the other party to execute and deliver this Agreement, except those representations specifically referenced herein. The parties have relied on their own judgment in entering into this Agreement.

**10.0**   MODIFICATIONS OR WAIVERS. Waivers or modifications of this Agreement, or of any covenant, condition, or limitation contained herein, are valid only if in writing duly executed by the parties hereto.

**11.0**   409A COMPLIANCE. Executive is solely responsible and liable for the satisfaction of any federal, state, province or local taxes that may arise with respect to this Agreement (including any taxes arising under Section 409A of the Code, except to the extent otherwise specifically provided in a written agreement with Genera). Neither Genera nor any of its employees, officers, directors, or service providers shall have any obligation whatsoever to pay such taxes, to prevent Executive from incurring them, or to mitigate or protect Executive from any such tax liabilities. Notwithstanding anything in this Agreement to the contrary, if any amounts that become due under this Agreement on account of Executive's termination of employment constitute "nonqualified deferred compensation" within the meaning of Code Section 409A, payment of such amounts shall commence when Executive incurs a "separation from service" within the meaning of Treasury Regulation § 1.409A-1(h). If, at the time of Executive's termination of employment under this Agreement, Executive is a "specified

- 9

employee" (under Internal Revenue Code Section 409A), any amount that constitutes "nonqualified deferred compensation" within the meaning of Code Section 409A that becomes payable to Executive on account of Executive's "separation from service" (including any amounts payable pursuant to the preceding sentence) will not be paid until after the end of the sixth calendar month beginning after Executive's separation from service (the **"409A Suspension Period"**). Within 14 calendar days after the end of the 409A Suspension Period, Executive shall be paid a lump sum payment in cash equal to any payments delayed because of the preceding sentence. Thereafter, Executive shall receive any remaining benefits as if there had not been an earlier delay.

**12.0**   GOVERNING LAW. This Agreement shall be governed pursuant to the laws of the State of California.

**13.0**   SEVERABILITY. If any part, clause, or condition of this Agreement is held to be partially or wholly invalid, unenforceable, or inoperative for any reason whatsoever, such shall not affect any other provision or portion hereof, which shall continue to be effective as though such invalid, unenforceable or inoperative part, clause or condition had not been made.

**14.0**   INTERPRETATION.

**14.1**   Section headings: The section and subsection heading of this Agreement are included for purposes of convenience only, and shall not affect the construction or interpretation of any of its provisions.

**14.2**   Gender and Number: Whenever required by the context, the singular shall include the plural, the plural shall include the singular, and the masculine gender shall include the neuter and feminine genders and vice versa.

**15.0**   NOTICES. All notices and other communications under or in connection with this Agreement shall be in writing and shall be deemed given (i) if delivered personally, upon delivery, (ii) if delivered by registered or certified mail (return receipt requested), upon the earlier of actual delivery or three (3) days after being mailed, (iii) if given by overnight courier with receipt acknowledgment requested, the next business day following the date sent, or (iv) if given by facsimile, if sent during business hours at the recipient's location, upon confirmation of transmission by telecopy, otherwise, upon the next business day after such confirmation, in each case to the parties at the following addresses:

To the Company:         Innova Holding Corporation
                        Off shore, State of Delaware
                        Attention:  Mr. Kuo Chen Wu
                        Email: jerry_wu@tyc.com.tw

To Executive:           Genera Corporation
                        2800 Saturn St. Brea, CA 92821
                        Attention: Jackson Kwok
                        Email: jackson@genera.com

- 10

**16.0**  JOINT PREPARATION.  All parties to this Agreement have negotiated it at length, and have had the opportunity to consult with and be represented by their own competent counsel.  This Agreement is therefore deemed to have been jointly prepared by the parties and any uncertainty or ambiguity existing in it shall not be interpreted against any party, but rather shall be interpreted according to the rules generally governing the interpretation of contracts.

**17.0**  THIRD-PARTY BENEFICIARIES:  No term or provision of this Agreement is intended to be, or shall be, for the benefit of any person, firm, organization or corporation not a party hereto, and no such other person, firm, organization or corporation shall have any right or cause of action hereunder**.**

**18.0**  DISPUTE RESOLUTION.  The Executive and the Company agree to submit to mandatory binding arbitration any and all claims arising out of or related to Executive's employment with Genera  and the termination thereof, including, but not limited to, claims for unpaid wages, wrongful termination, torts, stock or stock options or other ownership interest in Genera , and/or discrimination (including harassment) based upon any federal, state or local ordinance, statute, regulation or constitutional provision except that each party may, at its, his or her option, seek injunctive relief in court related to the improper use, disclosure or misappropriation of a party's private, proprietary, confidential or trade secret information (collectively, "Arbitrable Claims").  THE PARTIES HEREBY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN REGARD TO ARBITRABLE CLAIMS.  This Agreement does not restrict Executive's right to file administrative claims Executive may bring before any government agency where, as a matter of law, the parties may not restrict the Executive's ability to file such claims (including, but not limited to, the National Labor Relations Board, the Equal Employment Opportunity Commission and the Department of Labor).  However, the parties agree that, to the fullest extent permitted by law, arbitration shall be the exclusive remedy for the subject matter of such administrative claims.  The arbitration shall be conducted in Orange County, California through JAMS before a single neutral arbitrator, in accordance with the JAMS employment arbitration rules then in effect.  The JAMS rules may be found and reviewed at http://www.jamsadr.com/rules-employment-arbitration.  If Executive is unable to access these rules, please let me know and I will provide Executive with a hardcopy.  The arbitrator shall issue a written decision that contains the essential findings and conclusions on which the decision is based.

**19.0**  COOPERATION AND FURTHER ACTIONS.  The parties agree to perform any and all acts and to execute and deliver any and all documents necessary or convenient to carry out the terms of this Agreement.

**20.0**  ATTORNEYS' FEES.  In the event of any dispute related to or based upon this Agreement, the prevailing party shall be entitled to recover from the other party its reasonable attorneys' fees and costs.

**21.0**  COUNTERPARTS.  This Agreement may be executed in one or more counterparts, including electronically transmitted counterparts, each of which shall be deemed an original and all of which shall be considered one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

- 11

IN WITNESS WHEREOF, the parties hereto have executed, or caused their duly authorized representatives to execute, this Agreement as of the date first written above.

**Innova Holding Corporation,** a Delaware corporation

12/18/18

Name:  KUO CHEN WU

Title:  Chairman

**EXECUTIVE**

12/13/18

Jackson Kwok

Address: 2800 Saturn St. Brea, CA 92821

e-mail: jackson@genera.com

## Exhibit A

### DEFEND TRADE SECRETS ACT, 18 U.S. CODE § 1833 NOTICE:

**18 U.S. Code Section 1833 provides as follows:**

**Immunity From Liability For Confidential Disclosure Of A Trade Secret To The Government Or In A Court Filing.**  An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made, (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

**Use of Trade Secret Information in Anti-Retaliation Lawsuit.** An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

## **EXHIBIT B**

### **LIST OF PRIOR INVENTIONS**
### **AND ORIGINAL WORKS OF AUTHORSHIP**
Prior Invention

| Title | Date | Identifying Number or Brief Description |
|-------|------|------------------------------------------|
|       |      |                                          |

\_\_\_   No inventions or improvements
\_\_\_   Additional Sheets Attached



**<u>EXHIBIT C</u>**

**CALIFORNIA LABOR CODE SECTION 2870**
**INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENT**

"(a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

        (1)     Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

        (2)     Result from any work performed by the employee for the employer.

(b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.



# EXHIBIT B

## FORM OF GENERAL RELEASE

In exchange for good and valuable consideration set forth in that certain Employment Agreement (the "**Employment Agreement**") dated September 1, 2018, by and between the undersigned, Jackson Kwok ("**Executive**"), and Innova Holding Corporation, a Delaware corporation ("**Parent**") regarding the employment of Executive by Genera Corporation, a California corporation and wholly owned subsidiary of Parent (the "**Company**"), the sufficiency of which such consideration is hereby acknowledged, Executive, on behalf of himself, his executors, heirs, administrators, assigns and anyone else claiming by, through or under Executive, irrevocably and unconditionally, releases, and forever discharges the Company, and its predecessors, successors and related and affiliate entities, including parents and subsidiaries, and its shareholders, directors, officers, employees, attorneys, insurers, agents and representatives (collectively, the "**Released Parties**"), from, and with respect to, any and all debts, demands, actions, causes of action, suits, covenants, contracts, wages, bonuses, damages and any and all claims, demands, liabilities, and expenses (including, without limitation, attorneys' fees and costs) whatsoever of any name or nature both in law and in equity (severally and collectively, "**Claims**"), to the extent waivable under applicable law, that Executive now has, ever had or may in the future have against the Released Parties by reason of any matter, cause or thing that has happened, developed or occurred, and any Claims that have arisen, before the signing of this Release, including but not limited to, any and all Claims (i) in tort or contract, whether by statute or common law, (ii) relating to salary, wages, bonuses and commissions, the breach of an oral or written contract, unjust enrichment, promissory estoppel, misrepresentation, defamation, and interference with prospective economic advantage, interference with contract, wrongful termination, intentional and negligent infliction of emotional distress, negligence, breach of the covenant of good faith and fair dealing, and (iii) arising out of, based on, or in connection with Executive's employment by the Company (or any of its affiliates or subsidiaries) or the termination of that employment as set forth in the Employment Agreement, including, without limitation, any Claims for unlawful employment discrimination of any kind, whether based on age, race, sex, disability or otherwise, including specifically and without limitation, Claims arising under or based on Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, as amended, the Civil Rights Act of 1991, the Family and Medical Leave Act, the Americans with Disabilities Act, the Fair Labor Standards Act, the Employee Retirement Income Security Act of 1974, the Equal Pay Act of 1963, and any other local, state or federal equal employment opportunity or anti-discrimination law, statute, policy, order, ordinance or regulation; provided, however, that nothing herein shall release the Released Parties from the Excluded Claims (as defined below).

Executive hereby acknowledges that Executive may hereafter discover claims or facts in addition to or different from those which Executive now knows or believes to exist with respect to the subject matter of this Release and which, if known or suspected at the time of executing this Release, may have materially affected Executive's decision to enter into this Release. Nevertheless, Executive expressly waives any Claim (except for the Excluded Claims), to the extent waivable under applicable law, that might arise as a result of such different or additional claims or facts, and Executive hereby acknowledges, understands and irrevocably agrees that this Release extends to all Claims (except for the Excluded Claims), whether known or unknown, suspected or unsuspected. Executive further irrevocably and expressly waives and releases any rights and benefits which he has or may have under any law or rule of any jurisdiction pertaining

to the matters released herein and expressly waives and releases any and all rights and benefits conferred upon Executive by the provisions of Section 1542 of the Civil Code of the State of California, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

It is the intention of Executive through this Release and with the advice of counsel to fully, finally and forever settle and release the Claims set forth above (except for the Excluded Claims). In furtherance of such intention, the releases herein given shall be and remain in effect as full and complete releases of such matters notwithstanding the discovery of any additional claims or facts relating thereto.

Executive warrants and represents that Executive has not assigned or transferred to any person or entity any of the Claims released by this Release, and Executive agrees to defend (by counsel of the Company's choosing), and to indemnify and hold harmless, the Released Parties from and against any claims based on, in connection with, or arising out of any such assignment or transfer made, purported or claimed.

Notwithstanding anything to the contrary in this Release or the Employment Agreement, the foregoing release shall not cover: (i) the bonus payments set forth in Section 6.2 of the Employment Agreement to which Executive is entitled upon the termination of the Employment Agreement; (ii) the profit share set forth in Section 6.4 of the Employment Agreement to which Executive is entitled upon the termination of the Employment Agreement; (iii) provided that Executive does not breach or fail to perform any obligation hereunder, the continuous insurance coverage and expense reimbursements set forth in Section 4.2 of the Employment Agreement, including, without limitation, up to and through the 48-month period following the date of termination and as described in Section 6.5, and Executive shall provide evidence of his advanced payment for the Company's reimbursements; and (iv) any rights which cannot be waived as a matter of law (collectively, the "**Excluded Claims**").

The terms and agreements hereof, including their existence, shall be considered confidential information and shall not be disclosed by Executive to any third party except as required by law or court orders.

Executive shall indemnify and hold harmless the Released Parties against any and all losses, damages, liabilities, costs or expenses of whatever kind, including, without limitation, attorney's fees (collectively, the "Losses"), arising out of, resulting from or in connection with any breach or non-performance of any representation, warranty, covenants or obligation hereof by Executive. **EXECUTIVE HAS READ THIS RELEASE AND BEEN PROVIDED A FULL AND AMPLE OPPORTUNITY TO STUDY IT, AND EXECUTIVE UNDERSTANDS THAT THIS IS A FULL, COMPREHENSIVE AND GENERAL**

RELEASE AND INCLUDES ANY CLAIM UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT. EXECUTIVE ACKNOWLEDGES THAT EXECUTIVE HAS BEEN ADVISED IN WRITING TO CONSULT WITH LEGAL COUNSEL BEFORE SIGNING THIS RELEASE AND THE EMPLOYMENT AGREEMENT, AND EXECUTIVE HAS CONSULTED WITH AN ATTORNEY. EXECUTIVE WAS GIVEN A PERIOD OF AT LEAST TWENTY-ONE DAYS TO CONSIDER SIGNING THIS RELEASE, AND EXECUTIVE HAS SEVEN DAYS FROM THE DATE OF SIGNING TO REVOKE EXECUTIVE'S ACCEPTANCE BY DELIVERING TIMELY NOTICE OF HIS OR HER REVOCATION TO THE BOARD OF DIRECTORS OF PARENT AT ITS PRINCIPAL PLACE OF BUSINESS. EXECUTIVE IS SIGNING THIS RELEASE VOLUNTARILY, WITHOUT COERCION, AND WITH FULL KNOWLEDGE THAT IT IS INTENDED, TO THE MAXIMUM EXTENT PERMITTED BY LAW, AS A COMPLETE AND FINAL RELEASE AND WAIVER OF ANY AND ALL CLAIMS (TO THE EXTENT WAIVABLE UNDER APPLICABLE LAW). EXECUTIVE ACKNOWLEDGES AND AGREES THAT THE PAYMENTS SET FORTH IN THE EMPLOYMENT AGREEMENT ARE CONTINGENT UPON EXECUTIVE SIGNING THIS RELEASE AND WILL BE PAYABLE ONLY IF AND AFTER THE REVOCATION PERIOD HAS EXPIRED.

**(SIGNATURES APPEARS ON THE NEXT PAGE)**

*9/11/20*

Executive has read this Release, fully understand it and freely and knowingly agree to its terms.

Dated this 11 day of September, 2020.

**EXECUTIVE**

Jackson Kwok                    9/11/20
e-mail: jacksonkwok2020@gmail.com

**AGREED AND ACCEPTED:**
**Innova Holding Corporation, a Delaware corporation**

Name:  KUO CHEN WU
Title:  Chairman

-End-_

# EXHIBIT C

## CONFIDENTIAL SETTLEMENT AGREEMENT AND
## GENERAL RELEASE OF ALL CLAIMS

This Confidential Settlement Agreement and General Release of All Claims ("*Agreement*") is entered into between Jackson Kwok ("*Kwok*") and Innova Holding Corporation, and its wholly owned subsidiary Genera Corporation (together, the "*Company*") (Kwok and the Company collectively referred to as the "*Parties*").

### RECITALS

WHEREAS, Kwok and the Company entered into the Employment Agreement attached hereto as Exhibit A, effective September 1, 2018, through which Kwok commenced employment with the Company as its President and Chief Operating Officer, (the "*Employment Agreement*");

WHEREAS, pursuant to paragraph 6.4 of the Employment Agreement, upon prior approval by Mr. Chun Chi Wu (Chairman of Genera Corporation's Board of Directors), Kwok, at his discretion, was permitted to allocate the Company's annual Profit Share distributions (as defined in the Employment Agreement) to Genera's key staff, including himself;

WHEREAS, Kwok's employment with the Company terminated on August 31, 2020 (the "*Separation Date*"), and the Parties entered into the Form of General Release Agreement dated September 11, 2020 (the "*General Release Agreement*") attached hereto as Exhibit B, whereby Kwok released all claims he had against the Company, exclusive of any claims related to the Profit Share;

WHEREAS, following the Separation Date, a dispute arose between the Parties regarding Kwok's continued discretion to allocate the Company's 2020 Profit Share distribution, as a non-employee (the "*Profit Share Dispute*");

WHEREAS, Kwok has threatened to pursue legal claims against the Company arising from his former employment with Company and termination thereof, including, but not limited to, claims for breach of contract, breach of the covenant of good faith and fair dealing; failure to pay all wages due at termination; and waiting time penalties under Cal. Labor Code Section 203; and to recover damages against the Company for such alleged legal violations, including reasonable attorneys' fees, as set forth in the October 14, 2021 demand letter from Kwok's attorney, together with the Profit Share Dispute, (the "*Dispute*");

WHEREAS, the Company denies the allegations in the Dispute and otherwise denies that it violated any law in connection with Kwok's employment, the termination thereof, the Employment Agreement or otherwise; and

WHEREAS Kwok and the Company desire to mutually, amicably and finally resolve and compromise all issues and claims surrounding the Dispute, Kwok's employment by the Company and the termination thereof;

NOW THEREFORE, in consideration for the mutual promises and undertakings of the Parties as set forth below, Kwok and the Company hereby enter into this Agreement.

# AGREEMENT

1.    <u>Company's Consideration</u>.  As full, sufficient and complete consideration for Kwok's promises and releases contained herein, the payout date shall be no later than forty-five (45) days following the Effective Date (as noted in ¶ 21 (below)); the Company shall pay Kwok the gross sum of $180,000, less required federal and state payroll deductions, which represents settlement of Kwok's claim for alleged wage loss, through a check payable to "Jackson Kwok." The check shall be delivered via overnight mail, with tracking, to:

> The Law Offices of Charles P. Boylston, APC
> 41955 Fourth St., Suite 300
> Temecula, California 92590

2.    <u>General Release of Claims</u>.

(a)    The payments and promises set forth in this Agreement are in full satisfaction of all accrued salary, vacation pay, bonus and commission pay, profit sharing, stock options, termination benefits or other compensation to which Kwok may be entitled by virtue of Kwok's employment with the Company or Kwok's separation from the Company.  To the fullest extent permitted by law, Kwok, individually and on behalf of Kwok's attorneys, representatives, successors, and assigns, hereby releases and waives any other claims Kwok may have against the Company and its owners, agents, officers, shareholders, employees, directors, attorneys, subscribers, subsidiaries, affiliates, successors and assigns (collectively "***Releasees***"), whether known or not known, including, without limitation, claims arising out of or related in any way to the Dispute, the Employment Agreement, or the General Release Agreement, claims under any employment laws, including, but not limited to, claims of unlawful discharge, breach of contract, breach of the covenant of good faith and fair dealing, fraud, violation of public policy, defamation, physical injury, emotional distress, claims for additional compensation or benefits arising out of Kwok's employment or Kwok's separation of employment, claims under Title VII of the 1964 Civil Rights Act, as amended, the California Fair Employment and Housing Act and any other laws and/or regulations relating to employment or employment discrimination, including, without limitation, claims based on age or under the Age Discrimination in Employment Act or Older Workers Benefit Protection Act, and/or claims based on disability or under the Americans with Disabilities Act.  The Parties agree that any claims for money damages, loss of wages, earnings and benefits, medical expenses, attorneys' fees and costs, reinstatement and other equitable relief, are all released by this Agreement.

(b)    Kwok and the Company do not intend to release claims that Kwok may not release as a matter of law, including but not limited to claims for indemnity under California Labor Code section 2802.

3.    <u>Waiver of Unknown Claims</u>. By signing below, the Parties expressly waives any benefits of Section 1542 of the Civil Code of the State of California, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST

IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

4. <u>Non-Admission</u>. It is understood and agreed that this is a compromise settlement of a disputed claim or claims and that neither this Agreement itself nor the furnishing of the consideration for this Agreement shall be deemed or construed as an admission of liability or wrongdoing of any kind by the Company.

5. <u>Covenant Not to Sue</u>.

(a)    To the fullest extent permitted by law, at no time subsequent to the execution of this Agreement will Kwok pursue, or cause or knowingly permit the prosecution, in any state, federal or foreign court, or before any local, state, federal or foreign administrative agency, or any other tribunal, any charge, claim or action of any kind, nature and character whatsoever, known or unknown, which Kwok may now have, have ever had, or may in the future have against Releasees, which is based in whole or in part on any matter covered by this Agreement.

(b)    Nothing in this section shall prohibit or impair Kwok or the Company from complying with all applicable laws, nor shall this Agreement be construed to obligate either party to commit (or aid or abet in the commission of) any unlawful act.

6. <u>No Claims Filed</u>. Kwok affirms that he has not filed or caused to be filed any claim, complaint or action against Releasees in any forum, and that Kwok is not presently a party to or otherwise aware of any claim, complaint, or action against Releasees in any forum.

7. <u>Protected Rights</u>:  Kwok understands that nothing in the General Release and Waiver of Claims and Covenant Not to Sue sections above, or otherwise in this Agreement, limits Kwok's ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local government agency or commission ("*Government Agencies*"). Kwok further understands that this Agreement does not limit his ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company. This Agreement does not limit Kwok's right to receive an award for information provided to any Government Agencies.

8. <u>Acknowledgment of Payment of Wages and Expenses</u>. Kwok acknowledges that the Company has paid him for all wages, salary, bonuses, commissions, reimbursable expenses, accrued vacation and any similar payments due Kwok from the Company as of the Separation Date. Kwok acknowledges that the Company does not owe him any other amounts.

9. <u>Confidentiality</u>. Kwok agrees that the terms and conditions of this Agreement are strictly confidential and shall not be disclosed to any other persons except his counsel, immediate family, taxing authorities in connection with his filing of federal or state tax returns, or to financial advisors in order to comply with income tax filing requirements, or as required by legal

3

process or applicable law, provided however, that Kwok shall notify the Company if such disclosure is sought, allowing the Company the opportunity to object to such disclosure.

10.     Non-disparagement.  Kwok agrees not to disparage Releasees or their products, services, agents, representatives, directors, officers, shareholders, attorneys, employees, vendors, affiliates, successors or assigns, or any person acting by, through, under or in concert with any of them, with any written or oral statement.  Nothing in this paragraph shall prohibit Kwok from providing truthful information in response to a subpoena or other legal process.  Further, nothing in this Agreement prevents Kwok from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Kwok has reason to believe is unlawful.

11.     Return of Company Property.  To the extent Kwok has not already done so, he agrees to return to the Company on or before the Effective Date, all Company property, including but not limited to files and documents and other data, whether electronic or hardcopy, and whether in Kwok's possession or under his control.

12.     Confidential Information:  Kwok acknowledges that his employment by the Company created a relationship of confidence and trust with respect to any information of a confidential or secret nature that may have been disclosed to Kwok by the Company or a third party that relates to the business of the Company or to the business of any parent, subsidiary, affiliate, customer or supplier of the Company or any other party with whom the Company agrees to hold information of such party in confidence (the "*Confidential Information*").  Such Confidential Information includes, but is not limited to, client lists, client data, marketing plans, business strategies, financial information, personnel information, and other information not readily available to the public.  Kwok agrees to hold all Confidential Information in strictest confidence and that Kwok will not make use of such Confidential Information on behalf of anyone.  Kwok further confirms that he has delivered to the Company all documents and data of any nature containing or pertaining to such Confidential Information and that he has not taken with him any such documents or data or any reproduction thereof.

13.     Acknowledgement of Representation by Counsel; Attorneys' Fees.  Kwok acknowledges that he has been represented by counsel in the negotiation and preparation of this Agreement.  Kwok agrees that a rule of contract interpretation, i.e., that ambiguities in an agreement will be resolved against the drafter, shall not be employed in the interpretation or construction of this Agreement.  The Parties further agree that each party will be responsible for his or its own attorney's fees and costs incurred in connection with the Dispute and the negotiation, preparation, and drafting of this Agreement.

14.     Arbitration.  Except for any claim for injunctive relief arising out of a breach of a party's obligations to protect the other's proprietary information, the Parties agree to arbitrate any and all disputes or claims arising out of or related to the validity, enforceability, interpretation, performance or breach of this Agreement, whether sounding in tort, contract, statutory violation or otherwise, or involving the construction or application or any of the terms, provisions, or conditions of this Agreement.  The Parties agree that a neutral arbitrator from JAMS will administer any such arbitration(s) in accordance with the JAMS employment arbitration rules then in effect.  Any arbitration may be initiated by a written demand to the other

4

party and any arbitration hearing shall be conducted in Orange County, California. The arbitrator's decision shall be final, binding, and conclusive. The Parties further agree that this Agreement is intended to be strictly construed to provide for arbitration as the sole and exclusive means for resolution of all disputes hereunder to the fullest extent permitted by law. The Parties expressly waive any entitlement to have such controversies decided by a court or a jury.

15. <u>Governing Law</u>. This Agreement shall be construed in accordance with, and governed by, the laws of the State of California.

16. <u>Savings Clause</u>. Should any of the provisions of this Agreement be determined to be invalid by a court, arbitrator, or government agency of competent jurisdiction, it is agreed that such determination shall not affect the enforceability of the other provisions herein. Specifically, should a court, arbitrator, or agency conclude that a particular claim may not be released as a matter of law, it is the intention of the Parties that the general release, the waiver of unknown claims, and the covenant not to sue above shall otherwise remain effective to release any and all other claims.

17. <u>Complete and Voluntary Agreement; Time to Consider; Expiration of Offer</u>. This Agreement constitutes the entire agreement between Kwok and Releasees with respect to the subject matter hereof and supersedes all prior negotiations and agreements, whether written or oral, relating to such subject matter other than Exhibits A and B. Kwok acknowledges that neither Releasees nor their agents or attorneys have made any promise, representation or warranty whatsoever, either express or implied, written or oral, which is not contained in this Agreement for the purpose of inducing Kwok to execute the Agreement, and Kwok acknowledges that he has voluntarily executed this Agreement in reliance only upon such promises, representations and warranties as are contained herein. Kwok acknowledges and agrees that he has up to twenty-one (21) days in which to review and consider this Agreement, to consult with an attorney of his own choosing, and to decide whether or not to sign the Agreement (the "*Consideration Period*"). The offer set forth in this Agreement, if not accepted by Kwok before the end of the Consideration Period, will automatically expire.

18. <u>Revocation</u>. Kwok has seven (7) calendar days after signing this Agreement within which he may revoke this Agreement; provided that any such revocation must be dated within the seven-day period, addressed to the Company's counsel Bo-Sen Von of Lee and Li (bosenvon@leeandli.com), and transmitted via facsimile or electronic mail no later than seven (7) calendar days following the date on which she/he signs this Agreement.

19. <u>Modification</u>. No modification, amendment or waiver of any provision of this Agreement shall be effective unless in writing signed by Kwok and an authorized representative of the Company.

20. <u>Counterparts; Facsimile/PDF Signatures</u>. This Agreement may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument. Execution of a facsimile or PDF copy shall have the same force and effect as execution of an original.

21.     Effective Date of Agreement.  Provided Kwok has not revoked the Agreement, the eighth (8th) calendar day after Kwok executes this Agreement shall be deemed and referred to as the "Effective Date" of this Agreement. The Parties agree that the waivers and the releases given in this Agreement shall be effective and inclusive as of the "Effective Date."

Dated:  04/06/2022

_____
[Name, Title] KUO CHEN WU, Chairman
For Company

Dated:  3/31/2022

_____
Jackson Kwok

APPROVED AS TO FORM AND CONTENT.

THE LAW OFFICES OF CHARLES P.
BOYLSTON, APC

Dated:  4-5-2022

_____
Charles P. Boylston
Attorneys for Kwok

LEE AND LI, ATTORNEYS-AT-LAW

Dated:  04/06/2022

_____
Bo-Sen Von
Attorneys for Company

6

# EXHIBIT D

**COMPLAINT OF EMPLOYMENT DISCRIMINATION
BEFORE THE STATE OF CALIFORNIA
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
Under the California Fair Employment and Housing Act
(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**

Jackson Kwok                                        DFEH No. 202208-17955217

                                 Complainant,

vs.

Genera Corporation
2800 SATURN ST.
BREA, CA 92821

Jerry Wu
2800 SATURN ST.
BREA, CA 92821

Chun Chi Wu
2800 SATURN ST.
BREA, CA 92821

                                 Respondents

_____

**1.** Respondent **Genera Corporation** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2.**Complainant is naming **Jerry Wu** individual as Co-Respondent(s).
Complainant is naming **Chun Chi Wu** individual as Co-Respondent(s).

**3.** Complainant **Jackson Kwok**, resides in the City of **INDUSTRY,** State of **CA.**

**4.** Complainant alleges that on or about **August 31, 2021**, respondent took the following adverse actions:

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment and as a result was terminated, laid off, forced to quit, denied any employment benefit or privilege, other.

Date Filed: August 17, 2022

Form DFEH-ENF 80 RS (Revised 02/22)

1   **Additional Complaint Details:** Plaintiff was harassed and terminated due to retaliation of
2   complaint of possibly illegal business practices.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
                                              -2-
                              *Complaint – DFEH No. 202208-17955217*
27
    Date Filed: August 17, 2022
28
                                                              Form DFEH-ENF 80 RS (Revised 02/22)

1  VERIFICATION

2  I, **Edward Operini**, am the **Attorney** in the above-entitled complaint.  I have read the
3  foregoing complaint and know the contents thereof.  The matters alleged are based
   on information and belief, which I believe to be true.

4  On August 17, 2022, I declare under penalty of perjury under the laws of the State of
5  California that the foregoing is true and correct.

6                                                                  **City of Industry, CA**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                    -3-
                     *Complaint – DFEH No. 202208-17955217*
27
   Date Filed: August 17, 2022
28
                                                    Form DFEH-ENF 80 RS (Revised 02/22)